UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHOCOLATE INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 4649 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CORNERSTONE PROMOTION, INC., and PEPSICO, INC., d/b/a GREEN LABEL SOUND, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Chocolate Industries, Inc. alleges in this diversity suit that Defendants Cornerstone Promotion, Inc. and PepsiCo, Inc. violated Illinois law by tortiously interfering with Chocolate's contract with non-party Creating Art for Kids Everywhere ("CAKE"). Defendants have moved for summary judgment. Because Chocolate has put forth no evidence from which a reasonable jury could find that Defendants induced CAKE to breach its contract with Chocolate, the motion is granted.

The facts are stated as favorably to Chocolate as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Chocolate is an Illinois-based independent record label. Doc. 40-1 at ¶ 1. CAKE furnishes the services of hip hop recording artists Evan "Chuck Inglish" Ingersoll and Antoine "Sir Michael Rocks" Reed, who perform under the name "The Cool Kids." *Id*. at ¶ 7; *see* http://en.wikipedia.org/wiki/The_Cool_Kids. In 2007, Chocolate signed a contract with CAKE providing that The Cool Kids would record exclusively for Chocolate. Doc. 40-1 at ¶ 8; Doc. 43 at ¶ 2; Doc. 27-2 at pp. 8-20. The relationship was fraught with difficulty; numerous disputes arose in 2008, with CAKE ultimately

-1-

asserting that the contract was terminated due to Chocolate's breaches. Doc. 40-1 at ¶ 9. Consistent with that assertion, The Cool Kids recorded for various third parties in 2008 and 2009 and ceased performing under the Chocolate contract. *Id*. at ¶¶ 10, 14-15. In March 2009, CAKE brought suit in Illinois state court against Chocolate and its principal, Marvin Bedard, *see Creating Art for Kids Everywhere, LLC v. Chocolate Indus., Inc.*, No. 09 CH 09404 (Cir. Ct. Cook Cnty.), seeking a declaratory judgment that Chocolate had materially breached the Chocolate contract and that the contract therefore was invalid. Doc. 40-1 at ¶¶ 12, 17; Doc. 27-6. The complaint alleged, among other things, that CAKE had terminated the Chocolate contract on September 10, 2008, and had entered into negotiations with other music labels. Doc. 27-6 at ¶¶ 3, 34, 40. Chocolate filed a counterclaim accusing CAKE of various breaches of the contract. Doc. 40-1 at ¶ 16; Doc. 27-8. The counterclaim alleged, among other things, that The Cool Kids had released numerous recordings from 2008 to 2010 without Chocolate's authorization and had negotiated contracts with third party music labels seeking to license the group's recordings for use in video games, television, and other media. Doc. 27-8 at ¶¶ 30-49..

Cornerstone is a marketing and promotion firm. Doc. 40-1 at ¶ 2. PepsiCo is a Cornerstone client. *Id*. at ¶ 4. Operating under the name "Green Label Sound" and assisted by Cornerstone, PepsiCo uses music to market its products, including Mountain Dew soda. *Id*. at ¶¶ 3-4. In late December 2010, Cornerstone and CAKE signed a contract under which The Cool Kids would record exclusively for Cornerstone. *Id*. at ¶ 22; Doc. 43 at ¶ 5. Pursuant to that contract, Green Label Sound in 2011 released an album by The Cool Kids titled *When Fish Ride Bicycles*. Doc. 40-1 at ¶ 25.

Days before the album was set for release, Chocolate brought this suit against Defendants in state court. Doc. 1-1 at pp. 2-9. The suit alleges that the Chocolate contract remains valid and

enforceable, that CAKE breached the Chocolate contract by signing the Cornerstone contract, and that Defendants induced the breach. *Ibid*. As relief, Chocolate seeks an injunction prohibiting Defendants from releasing any Cool Kids recordings. *Id*. at 8-9. Chocolate asked the state court to issue a temporary restraining order enjoining Defendants from proceeding with the then-impending release of *When Fish Ride Bicycles*. Doc. 6 at 7-17. Before the state court could rule on the motion, Defendants removed the case to federal court on diversity grounds. Doc. 1. Chocolate re-filed its motion for a temporary restraining order, Doc. 6, which this court denied in an oral ruling, Doc. 9.

  Defendants' removal of this case was proper. The parties are diverse: Chocolate is an Illinois corporation with its principal place of business in Illinois, while Cornerstone is a Delaware corporation and PepsiCo is a North Carolina corporation, each with its principal place of business in New York. Doc. 40-1 at ¶¶ 1-3. As for the amount-in-controversy, "[i]n suits seeking the equitable remedies of an injunction or a declaratory judgment, the amount in controversy is determined by the value … of the object of the litigation." *America's MoneyLine, Inc. v. Coleman*, 360 F.3d 782, 786 (7th Cir. 2004). Under the "either viewpoint" rule, that value may "be assessed looking at either the benefit to the plaintiff or the cost to the defendant of the requested relief." *Uhl v. Thoroughbred Tech. and Telecomms., Inc.*, 309 F.3d 978, 983 (7th Cir. 2002); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 609-10 (7th Cir. 1997). Only if it is "legally certain" that the value will be less than the jurisdictional amount, or "legally impossible" that the value will exceed the jurisdictional amount, can the case be dismissed for failure to satisfy the amount-in-controversy requirement. *See Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 830 (7th Cir. 2011); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006). The cost to Defendants of the injunction sought by

Chocolate cannot be said to a "legal certainty" not to exceed $75,000, given the moderate success of the *When Fish Ride Bicycles* release. *See* http://www.ballerstatus.com/2011/07/21/album-charts-indies-make-splash-on-billboard-200-cool-kids-mellowhype-trae-tha-truth/. There is no basis to doubt Defendants' submission in their notice of removal that Chocolate "seeks to prevent The Cool Kids from providing services to Defendants the value of which … exceeds $75,000." Doc. 1 at ¶ 4.

Chocolate contends that their tortious interference claim is governed by Illinois law, Doc. 40 at 3, and Defendants do not disagree, so the court will apply that law. *See McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998). Under Illinois law, a plaintiff claiming tortious interference with contract must establish five elements: "(1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages." *Echo, Inc. v. Timberland Machines & Irrigation, Inc.*, 661 F.3d 959, 968 (7th Cir. 2011); *see also Complete Conference Coordinators, Inc. v. Kumon N. Am., Inc.*, 915 N.E.2d 88, 93 (Ill. App. 2009). Defendants' principal argument is that the third and fourth elements are not present because they did not induce CAKE to breach the Chocolate contract. According to Defendants, the record indisputably shows that CAKE terminated the Chocolate contract on its own initiative, announced the termination long before it entered into the Cornerstone contract, and took the initiative in approaching Defendants about signing with Green Label Sound. Doc. 35 at 7-10.

The Chocolate contract provides that The Cool Kids shall record exclusively for Chocolate; because the Cornerstone contract provides that The Cool Kids shall record

exclusively for Green Label Sound, the Cornerstone contract is inconsistent with the Chocolate contract. Whether the Chocolate contract remained valid and enforceable as of December 2010, when the Cornerstone contract was signed, is the central issue in the pending state court litigation between CAKE and Chocolate. Doc. 40-1 at ¶ 12. The court will not consider that issue here, for even assuming that Chocolate retained its contractual right to The Cool Kids' exclusive services as of 2010, meaning that CAKE breached the Chocolate contract when it signed the Cornerstone contract, Defendants are entitled to summary judgment because there is no evidence from which a reasonable jury could conclude that Defendants induced the breach.

To determine whether Chocolate has adduced such evidence, it is necessary to examine the parties' Local Rule 56.1 submissions. Paragraph 19 of Defendants' Local Rule 56.1(a)(3) statement asserts:

> In the summer of 2010, Cornerstone was approached by Christopher Watkins, the manager of the Cool Kids, who raised the possibility of the release of a record by The Cool Kids on the Green Label Sound label, and related promotion activities. Cornerstone and PepsiCo did not seek out the Cool Kids for this project. Rather, The Cool Kids approached Cornerstone unsolicited.

Doc. 28 at ¶ 19 (citations omitted). For support, Paragraph 19 cites the declaration of Patrick Schmidt, Cornerstone's Director of Strategic Marketing, which includes an averment that essentially tracks Paragraph 19. Doc. 27-10 at ¶ 5. Paragraph 19 also cites an August 2010 email exchange between The Cool Kids' manager and Schmidt's subordinate regarding the possibility of the band "putting out an EP with Green Label Sound" with six songs. Doc. 27-11. "EP" is the acronym for "extended play," a term for a music recording "that contains more music than a single, but is too short to qualify as a full studio album or LP ['long play']." http://en.wikipedia.org/wiki/Extended_play.

Chocolate's Local Rule 56.1(b)(3)(B) response denies Paragraph 19, and in support cites two pieces of evidence. Doc. 40-1 at ¶ 19. The first is a passage from Schmidt's deposition concerning a November 2009 discussion between Cornerstone and CAKE about CAKE's potentially releasing a Cool Kids song via Green Label Sounds' iTunes store. Doc. 40-2 at 73-75. The second is an email chain recording that November 2009 discussion, or at least a portion thereof. Doc. 40-3.

Those two pieces of evidence do not speak to, let alone contradict, Paragraph 19 of Defendants' Local Rule 56.1(a)(3) statement. Paragraph 19 asserts that in the summer of 2010, The Cool Kids' manager approached Cornerstone, unsolicited, about releasing a record (an EP) on the Green Label Sound label and also about related promotional opportunities. The evidence cited by Chocolate, by contrast, references a November 2009 discussion, whose outcome is unclear, about The Cool Kids' releasing one song through Green Label Sounds' iTunes store. That discussion does not reference a potential recording contract between CAKE and Defendants, and Chocolate does not assert, in either its Local Rule 56.1(b) materials or its brief, that the November 2009 discussion about releasing a song on iTunes led either to the summer 2010 discussions regarding the EP or to the actual Cornerstone contract. Chocolate's evidence therefore shows only that Cornerstone and CAKE discussed a different subject several months before the discussions that led to the Cornerstone contract. That evidence does not undercut Defendants' submission that CAKE initiated the later discussions. Because Chocolate has not produced any evidence that controverts Defendants' Paragraph 19, that paragraph is deemed admitted. *See* N.D. Ill. L.R. 56.1(b)(3) ("All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party."); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000) ("An

answer that does not deny the allegations in the numbered paragraph with citations to *supporting* evidence in the record constitutes an admission.") (emphasis added); *Nicholson v. Allstate Ins. Co.*, 2012 WL 182216, at *5-6 (N.D. Ill. Jan. 23, 2012).

Because the record indisputably establishes that CAKE made an unsolicited approach to Cornerstone in 2010, this case boils down to this question: Can a defendant be held to have induced a third party to breach its contract with the plaintiff where the defendant received an unsolicited proposal from the third party that, when accepted, resulted in the third party's taking actions inconsistent with its contract with the plaintiff—particularly where the third party previously announced to the world that its contract with the plaintiff had terminated and where the third party already had taken numerous actions inconsistent with that contract? The answer is no. Illinois law is clear on this point: "In order to be held liable for interference with a contract the defendant must be shown to have caused the interference. It is not enough that he merely reaped the advantages of the broken contract after the contracting party has withdrawn from it of his own motion." *Farley v. Kissell Co.*, 310 N.E.2d 385, 390 (Ill. App. 1974) (quoting Prosser, Handbook on the Law of Torts § 129 (4th ed. 1971)); *see also In re Estate of Albergo*, 656 N.E.2d 97, 103-04 (Ill. App. 1995) ("Establishing inducement, in the context of a claim for tortious interference with a contract, requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.") (internal quotation marks omitted). The Restatement is in accord: "One does not induce another to commit a breach of contract with a third person … when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person." Restatement (Second) of Torts § 766, comment n.

The point is illustrated by *Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc.*, 573 N.E.2d 1370 (Ill. App. 1991). Sullivan's Wholesale Drug Company had an exclusive contract with Hillsboro Hawthorne Lodge, a nursing home, to provide pharmacy services to Hillsboro's residents. *Id*. at 1372. Hillsboro proposed an amendment to the contract, Sullivan's refused, and Hillsboro terminated the contract, giving the business to Faryl's Pharmacy and then to Enloe Drugs. *Id*. at 1373-74. Sullivan's sued Faryl's and Enloe for tortiously interfering with Sullivan's contract with Hillsboro. The trial court granted summary judgment to Faryl's and Enloe, and the Appellate Court of Illinois affirmed, reasoning as follows:

> In the record before us there is no evidence that Faryl's or Enloe induced or caused either the residents of the nursing home or the nursing home itself to sever the business relationships which they had with Sullivan's. Although there was certainly communication between [Hillsboro's owner] and Faryl's and Enloe prior to the termination of plaintiff's services, there is no genuine issue that those communications were initiated by [Hillsboro's owner], not Faryl's or Enloe. There is absolutely no indication that Faryl's or Enloe actively solicited Sullivan's business. They merely agreed to take over that business after Sullivan's was terminated. Plaintiff has not cited and we have not found any authority which suggests that such an agreement, standing alone, is sufficient to constitute actionable inducement.

*Id*. at 1375. The circumstances in *Sullivan's* are analogous to those here.

Two New York cases affirming the grant of summary judgment against tortious interference plaintiffs reach the same result on comparable facts. In *Saja Music Co. v. Sony Music Entm't, Inc.*, 622 N.Y.S.2d 241, 242 (N.Y. App. 1995), the court held that the plaintiff, Saja Music, "failed to establish that defendant Sony had 'intentionally induced' a breach of the Recording Artist Agreement between [Saja] and recording artist 'Stevie B.'" where "[t]he record reveal[ed] that Stevie B. voluntarily sent a … Notice of Termination to [Saja] citing what he perceived to be [Saja's] pre-existing breaches and formally declaring that he considered their agreements to be 'void *ab initio* and of no force and effect,' and, two months thereafter,

-8-

independently solicited and initiated discussions concerning a new recording agreement with numerous record companies ... which subsequently resulted in his $1.6 million recording contract with Sony." *Id*. at 242. Likewise, in *Rapp Boxx, Inc. v. MTV, Inc.*, 642 N.Y.S.2d 228 (N.Y. App. 1996), the court held that the "plaintiff failed to come forward with proof in evidentiary form establishing that MTV [the defendant] had 'intentionally induced' a breach of" the plaintiff's contract with an entertainer named Lover where "the evidence, including corroboration by … Lover, shows that MTV never solicited him for a role in its competing rap music show, that he voluntarily repudiated his contract with plaintiff in September 1988, and that he independently solicited and initiated discussions with MTV for a position as a host of MTV's show months after the alleged breach." *Id*. at 228. Although these decisions apply New York law, there is no reason to believe that New York law differs materially from Illinois law in any relevant respect. *Compare Echo*, 661 F.3d at 968 (a plaintiff alleging tortious interference with contract under Illinois law must establish, among other things, "defendant's intentional and unjustified inducement of a breach"), *with Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993) (a tortious interference plaintiff proceeding under New York law must establish, among other things, "defendant's intentional inducement of the third party to breach or otherwise render performance impossible").

In its opposition brief, Chocolate appears to advance a different argument, that Defendants induced CAKE to breach the Chocolate contract in 2008 rather than in 2010. The argument's factual premise is that Cornerstone entered into an agreement with *Chocolate* in 2008 to license a Cool Kids song called "Delivery Man," and that around the same time, in May 2008, CAKE first announced its repudiation of the Chocolate contract. Doc. 40 at 4-5, 7. According to Chocolate's brief, which relies solely on the deposition testimony of Bedard, Doc.

41-1 at 1-8, a jury could infer from this coincidence in timing that Cornerstone was behind CAKE's decision to terminate. But Bedard's testimony regarding the supposed connection between the 2008 and 2010 events is pure speculation and utterly insufficient to support a verdict in Chocolate's favor. *See Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) ("uncorroborated, self-serving testimony cannot support a claim if the testimony is based on speculation, intuition, or rumor") (internal quotation marks omitted); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989) ("A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture."). In any event, in its proposed surreply brief, Chocolate abandoned this theory, saying that "the purported termination of [the Chocolate] agreement in May 2008 is not the issue; the issue is CAKE's ultimate permanent breach of its exclusive recording artist agreement with Plaintiff by entering into its exclusive recording artist agreement with Cornerstone in 2010," and adding that "whether or not Defendants had anything to do with CAKE's purported May 2008 termination of its agreement with Plaintiff is immaterial." Doc. 45-1 at 6-7. The court denied Chocolate leave to file the surreply brief, Doc. 48, but the brief nonetheless demonstrates that Chocolate did not actually intend to press the argument that its opposition brief appears to make.

Chocolate asserts that it should be allowed to conduct further discovery. The request is rejected on two independent grounds. First, Chocolate has not complied with Federal Rule of Civil Procedure 56(d), which requires a non-movant seeking further discovery to "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to the summary judgment motion. Fed. R. Civ. P. 56(d). Chocolate has filed no such affidavit or declaration, which is reason enough to deny further discovery. *See Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000) ("A litigant's failure to file an affidavit in

support of a Rule 56(f) [the predecessor to Rule 56(d)] motion justifies denial of the motion."); *Rodriguez v. Kane Cnty. Sheriff's Merit Comm'n*, 2012 WL 280360, at *7 (N.D. Ill. Jan. 31, 2012) (same).

Second, Chocolate itself bears responsibility for its failure to fully pursue discovery prior to the summary judgment phase. The discovery deadline originally was set for December 7, 2011. Doc. 16. On November 30, 2011, the court extended the deadline to February 17, 2012, warning that "no further extensions will be granted absent extraordinary circumstances." Doc. 21. Defendants assert without contradiction that Chocolate did not serve any document requests or notice any depositions until February 3, 2012, two weeks before the extended discovery deadline. Doc. 44 at 12-13; Doc. 44-1. Chocolate offers no explanation, in its rejected surreply or elsewhere, for its nonchalance in pursuing discovery, and it now must bear the consequences for its failure to take discovery that might have turned up evidence that might have assisted its efforts to forestall summary judgment.

For these reasons, Defendants are entitled to summary judgment.

August 20, 2012

United States District Judge